**STATE OF LOUISIANA**
**COURT OF APPEAL, THIRD CIRCUIT**

**22-744**

**FAYE HARVEY AND NELFORD HARVEY**

**VERSUS**

**LARAMIE D. HARPER**

**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
ELEVENTH JUDICIAL DISTRICT COURT
PARISH OF SABINE, NO. 68,862
HONORABLE ERIC R. HARRINGTON, JUDGE PRO-TEMPORE

**\*\*\*\*\*\*\*\*\*\***

**GARY J. ORTEGO**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Elizabeth A. Pickett, Chief Judge, Sharon Darville Wilson, and Gary J. Ortego, Judges.

**REVERSED AND RENDERED.**

Adam M. Sullivan
Attorney at Law
730 San Antonio Ave
Many, LA 71449
(318) 256-0076
COUNSEL FOR DEFENDANT/APPELLEE:
    Laramie D. Harper

Elvin Fontenot
Attorney At Law
110 East Texas Street
Leesville, LA 71446
(337) 239-2684
COUNSEL FOR PLAINTIFFS/APPELLANTS:
    Faye Harvey
    Nelford Harvey

**ORTEGO, Judge.**

In this matter, the trial court granted the mother's motion to modify a prior consent custody judgment, granting her principal custody of her six-year-old child, and removing custody from the child's paternal grandparents, who had custody for the last four years. The grandparents appeal.

## FACTS AND PROCEDURAL HISTORY

The principal parties are Faye and Nelford Harvey (the Harveys), paternal grandparents of the now seven-year-old minor child Cheyenne (Cheyenne), born February 15, 2016, and Cheyenne's mother, Laramie Harper (Ms. Harper). Also named as party to these proceedings is Cheyenne's biological father, Jonathan Ebarb (Ebarb).

The facts originally giving rise to this custody dispute are largely undisputed. The record establishes that on or about January 27, 2018 the Harveys assumed the physical custody and primary responsibility for their grandchild, Cheyenne, who was not quite two years old when, by her own admission, Ms. Harper was suffering from serious untreated substance abuse and mental health issues that overwhelmed her ability to properly care for Cheyenne. The record shows that Ms. Harper's drug abuse and erratic behavior continued and became particularly evident that one night in 2018, when the grandmother, Mrs. Harvey, was summoned to their house in response to Ms. Harper's uncontrolled behavior and Ms. Harper saying she wanted to leave, in her compromised condition, with Cheyenne, to go to Waco, Texas, where her father resided. At this point, Mrs. Harvey offered to take physical custody of Cheyenne, and pleaded with Ms. Harper to seek help. Ms. Harper agreed to leave Cheyenne with the Harveys and she left the house. Cheyenne has remained in the physical care and custody of the grandparents, the Harveys, from January 2018 through Christmas Eve 2022.

In those four plus years, Cheyenne has lived with the Harveys, in Sabine Parish, while Ms. Harper has resided in various locations, including the Shreveport-Bossier area.

*2018 Proceedings*

This custody litigation was initiated in April 3, 2018, when Cheyenne's grandparents, the Harveys, filed a "Petition for Temporary Custody", including *Ex Parte* Custody Order, pursuant to the informal custody agreement by the parties, which the trial court granted and signed. The *Ex Parte* Order granted the Harveys "immediate temporary care, custody, and control" of Cheyenne, subject to Ms. Harper's "reasonable visitation as permitted by Oxford House and as coordinated with Ms. Harper's extended family." The trial court's order scheduled a full hearing for April 19, 2018, so Ms. Harper could "show cause" why the Harveys "should not be granted sole custody" of Cheyenne, subject to her "reasonable supervised visitation."

However, on that April 19, 2018 hearing date, the matter was continued to allow Ms. Harper additional time to retain counsel, while by stipulation the parties agreed that Ms. Harper would be allowed "24 hours supervised visitation with Cheyenne." By agreement of all parties the full custody hearing was rescheduled to May 10, 2018.

Presumably still unable to secure counsel, Ms. Harper appeared *pro se* for the custody hearing. The transcript of that hearing clearly shows that both Ms. Harper and the Harveys vied for custody and principal domiciliary status over Cheyenne. The hearing resulted in a custody judgment, dated and signed May 21, 2018, by which the Harveys were granted temporary custody of the minor Cheyenne, subject to reasonable supervised visitation by Ms. Harper, the father, Ebarb, the grandparents or anyone else agreed to by the parties. The judgment further ordered

2

the parties to return to court November 9, 2018, "to determine the permanent custody of Cheyenne Harper." On that date the parties entered into stipulations and a consent judgment, extending the May 21, 2018 custody decree with continued custody by the Harveys, which stipulated custody judgment was approved and signed by the trial court on November 9, 2018.

*2018-2021 Dormancy*

The record lay dormant between November 9, 2018, and these proceedings, initiated by Ms. Harper's Motion to Modify Custody, filed June 13, 2022, resulting in the judgment before us presently on appeal.

*2022 Hearing and Judgment*

The record shows that for about four years after the Consent Judgment of November 9, 2018, continued custody of Cheyenne remained with the Harveys when Ms. Harper's Motion to Modify Custody was filed on June 13, 2022. Throughout this extended period, Ms. Harper was allowed visitation one day per week from 8:30 a.m. to 5:00 p.m. and permitted to call Cheyenne daily at 7:00 p.m. The record shows that prior to Ms. Harper's filing her Motion in 2022, Ms. Harper inconsistently exercised her daily call allowance and sporadically exercised her reasonable supervised visitation privileges with Cheyenne. Those visits were almost exclusively exercised in Sabine Parish, with Ms. Harper's grandfather, Larry White, who lived near the Harveys and Cheyenne.

This November 2018 Consent Judgment, like other custody orders/judgments that came before it, were a direct result of Ms. Harper's admitted continuing substance abuse and mental health issues.

*Evidence Adduced at Trial*

Ms. Harper's Motion to Modify Custody was heard on July 15, 2022. The trial court was presented with testimony by movant, Ms. Harper, and her grandfather, Larry White, in support of her motion. The paternal grandparents, the Harveys, presented both testimony and other evidence to the trial court in their opposition to Ms. Harper's motion. The Harveys testified and presented corroborating testimony from other witnesses as to their providing Cheyenne with a safe, secure and nurturing environment, as to her school and education, and as to their continuing care and custody of Cheyenne for the last four years. This factual evidence presented included the testimony of their niece, Cassie Bell, longtime friends Sandra Wells and Robert Lewis, along with Cheyenne's kindergarten teacher, Sherry Sepulvado.

The only documentary evidence submitted by Ms. Harper and admitted into evidence at the July hearing were Ms. Harper's drug abuse treatment records from CADA from 2018 through January of 2019, along with psychiatric progress notes and a Prozac prescription dated July 3, 2019, without any evidence of any further follow-up drug testing or treatment for Ms. Harper since 2019.

As to Cheyenne's father, Ebarb admitted that he had recently been arrested on charges of drug possession and distribution. Although Ebarb testified, he refused to answer questions related to the particulars about his arrest, including his proximity to Cheyenne at the time of his arrest, asserting his Fifth Amendment rights. We note that although Ebarb was made a party in Ms. Harper's motion for modification, he neither objected to nor appealed either the stipulated custody order of November 9, 2018 or the December 24, 2022 judgment at issue in this appeal.

In addition, and by stipulation the entire suit record going back to the initial April 3, 2018 hearing, was introduced, but its contents revealed no additional probative evidence.

After receiving Post-Trial Memoranda from the parties, the trial court granted Ms. Harper's Motion to Modify the November 2018 Consent Judgment, granting the Harveys and Ms. Harper shared joint custody, with the Harveys to be designated domiciliary "parents" through December 24, 2022, at 6 p.m., and then designating Ms. Harper to become domiciliary parent of Cheyenne thereafter. The judgment further spelled out the visitation schedules for the Harveys thereafter. From that judgment the Harveys perfected this appeal by Motion and Order dated August 25, 2022.

## ASSIGNMENT OF ERROR

The Harveys' only assigned error is that the trial court erred when it found that the best interest of the child, Cheyenne, was to modify the consent custody decree of November 9, 2018.

## STANDARD OF REVIEW

The trial court's factual conclusions are given substantial deference by appellate courts in child custody matters. *Steinebach v. Steinebach*, 07-38 (La.App. 3 Cir. 5/2/07), 957 So.2d 291. Unless there is a legal error, "[t]he determinations made by the trial judge as to custody…will not be set aside unless it clearly appears [from the record] that there has been an abuse of discretion[.]" *Nugent v. Nugent,* 232 So.2d 521, 523 (La.App. 3 Cir.1970); *see also Mulkey v. Mulkey,* 12-2709 (La. 5/7/13), 118 So.3d 357. "The basis for this principle for review is grounded not only upon the better capacity of the trial court to evaluate live witnesses, but also upon the proper allocation of trial and appellate functions between the respective courts."

*McCorvey v. McCorvey*, 05-174, p. 4 (La.App. 3 Cir. 11/2/05), 916 So.2d 357, 362, *writ denied,* 05-2577 (La. 5/5/06), 927 So.2d 300.

Absent legal error, appellate courts must "review the record in its entirety and (1) find that a reasonable basis does not exist for the finding, and (2) further determine that the record clearly establishes that the fact finder is clearly wrong or manifestly erroneous" before a court's factual findings and conclusions can be reversed. *Moss v. Goodger*, 12-783, p. 5 (La.App. 3 Cir. 12/12/12), 104 So.3d 807, 810.

Additionally, when a trial court applies incorrect legal principles and these errors materially affect the outcome of a case and deprive a party of substantial rights, legal error occurs. *Evans v. Lungrin,* 97-541, 97-577 (La. 2/6/98), 708 So.2d 731. "[W]here one or more trial court legal errors interdict the fact-finding process, the manifest error standard is no longer applicable, and, if the record is otherwise complete, the appellate court should make its own independent *de novo* review of the record and determine a preponderance of the evidence." *Id. a*t 735.

The time parents with joint legal custody share with their children is a physical custody allocation of a joint custody plan. *Francois V. Leon,* 02-460 (La.App. 3 Cir. 11-27-02), 834 so.2d 1109. In an action to modify a custody decree, the trial court must first determine whether the decree is a considered decree or a consent decree. *See Moss*, 104 So.3d 807. "A consent judgment is a bilateral contract [.]" *Burns v. Burns*, 17-343, p. 6 (La.App. 1 Cir. 11/3/17), 236 So.3d 571, 575. When the underlying decree is a stipulated judgment, as it is in this matter, the moving party has the burden of proving that a material change in circumstances has occurred since rendition of the underlying decree, and that the modification will be in the child's best interest. *See Evans*, 708 So.2d 731.

In *Prather v. McLaughlin*, 16-604, p. 5 (La.App. 3 Cir. 11/2/16), 207 So3d 581, 585, this court stated as to this twofold burden of proof:

> However, in order to achieve stability and avoid continuous litigation our courts…have also added an additional condition on a parent who wishes to modify a prior stipulated joint custody decree-proof that there has been a material change in circumstance since the last decree warranting a change in custody that the court finds is in the best interest of the child.

Moreover, "the ultimate question which must be answered is whether the change in circumstances will negatively impact the welfare of the child." *Leblanc v. Leblanc*, 06-1052, p. 9 (La.App. 3 Cir. 2/14/07), 951 So.2d 500, 507, *writ denied,* 07-562 (La. 4/5/07), 954 So.2d 146.

In *Joubert v. Joubert,* 19-349, p. 6 (La.App. 3 Cir. 11/13/19), 285 So.2d 7, 12-13, this court stated:

> Should the party urging a change of the physical custody allocation of a joint custody plan fail to show a material change in circumstances, the inquiry ends, and there is no basis for altering the consent judgment. *Lunney v. Lunney,* 11-1891 (La.App. 1 Cir. 2/10/12), 91 So.3d 350, *writ denied,* 12-610 (La. 4/4/12), 85 So.3d 130. Each "custody case must be viewed withing its own peculiar set of facts." *Cedotal*, 927 So,2d. at 437. Thus, a trial court's determination of whether a material change in circumstances has occurred is a factual finding. *See Kyle v. Kier*, 17-134 (La.App. 3 Cir. 11/15/17), 233 So.3d 708; *See also Bonnecarrere v. Bonnecarrere*, 09-1647 (La.App. 1 Cir. 4/14/10), 37 So3d 1038, *writ* denied, 10-1639 (La. 8/11/10), 42 So3d 387.

Nevertheless, "[a]n appellate court … is not compelled to slavishly rubberstamp a trial court's finding." *Guin v. Guinn*, 16-926, p. 21 (La.App. 3 Cir.5/31/17), 223 So.3d 139, 152; *Moss*, 104 So.3d at 810.

## LAW AND DISCUSSION

In this matter, Ms. Harper was seeking to modify a stipulated consent judgment of November 9, 2018, that awarded sole temporary custody to the non-parents, grandparents, the Harveys.

On appeal, the parties agree that Ms. Harper, as the parent seeking to modify this stipulated consent judgment bears the burden of proof of a "material change in circumstances," as well as the "best interest" of the minor child. The Louisiana Supreme Court has explained the two-step burden of proof applicable to stipulated custody awards:

> [A] biological parent with joint custody, who seeks modification of a *stipulated* custody award to obtain greater custodial rights, must prove: 1) there has been a material change in circumstances after the original custody award; and 2) the proposed modification is in the best interest of the child. *See Evans v. Lungrin*, 97–0541, 97–0577, p. 13 (La.2/6/98), 708 So.2d 731, 738; *cf. Bergeron v. Bergeron*, 492 So.2d 1193 (La.1986).

*Tracie F.*, 15-1812, p. 2 (La. 3/15/16), 188 So.3d 231, 235 (emphasis added).

This two-step burden of proof stands in contrast to the far more onerous three-step burden of proof that applies to parties who wish to modify *permanent* custody judgments previously rendered by "*considered decree.*" *Tracie F*, 188 So. 3d at 239–40.

Given that the November 9, 2018, judgment, as well as the others rendered to essentially identical effect pertained to *temporary*, not permanent custody, we conclude that the trial court correctly suggested that Ms. Harper was required to discharge both prongs of the *Tracie F.* two-step burden of proof to prevail on her motion to modify the stipulated custody status by Cheyenne's grandparents, the Harveys.

*Application of Tracie F. Two-Step Burden of Proof*

Having acknowledged that the two-step burden of proof fell upon Ms. Harper to modify the prior custody decree, we next examine whether the trial court correctly applied it before rendering judgment in favor of Ms. Harper's motion.

We do so while bearing in mind the well settled Constitutional due process protected rights of parents when it concerns their biological children:

> [B]iological parents have constitutionally protected rights regarding their children. Further, as this court has explained, the Fourteenth Amendment to the United States Constitution protects a biological parent's due process right to "the companionship, care, custody, and management" of a child. *See* Tracy F., 188 So.3d at 242 (citing *Santosky v. Kramer*, 455 U.S. 745, 758–59, 102 S.Ct. 1388, 71 L.Ed.2d 599 (1982), and *Lassiter v. Department of Social Services*, 452 U.S. 18, 27, 101 S.Ct. 2153, 68 L.Ed.2d 640 (1981)). Similarly, "we have implicitly recognized that the reciprocal rights and obligations of natural parents and children are among those unenumerated rights retained by individuals pursuant to La. Const. art. 1, § 24." *In re Adoption of B.G.S.*, 556 So.2d at 551. A biological parent cannot be deprived of these and other related rights without a procedure that adequately balances three factors.

*Tracie F.*, 188 So.3d at 242.

Here, while Ms. Harper has the highest priority and constitutional protection as to her minor child, Cheyenne, so too as the parent seeking to modify the current consent judgment of November 9, 2018, Ms. Harper bears the burden of proof of a "material change in circumstances", as well as the "best interest" of the minor child in her requested modifications.

Nevertheless, assuming all parties' due process rights are protected, these considerations are subordinate to our principal concern, that the best interest of the child is paramount:

> The best interest of the child is the sole criterion to be met in making a custody award, as the trial court sits as a sort of fiduciary on behalf of the child and must pursue actively that course of conduct which will be of the greatest benefit to the child. *C.M.J. v. L.M.C.*, 14–1119 (La.10/15/14), 156 So.3d 16, 28, quoting

*Turner v. Turner*, 455 So.2d 1374, 1378 (La.1984). It is the child's emotional, physical, material and social well-being and health that are the court's very purpose in child custody cases; the court must protect the child from the real possibility that the parents are engaged in a bitter, vengeful, and highly emotional conflict. *Id.* The legislature has mandated that the court look only to the child's interests so that the court can fulfill its obligations to the child. *Id.* at 28–29.

*Hodges v. Hodges*, 15-585, pp. 2-3 (La. 11/23/15), 181 So.3d 700, 702.

"When a law is clear and unambiguous and its application does not lead to absurd consequences, the law shall be applied as written and no further interpretation may be made in search of the intent of the legislature," La.Civ.Code art. 9, and La.Civ.Code art. 131 plainly states that "In a proceeding for divorce *or thereafter*, the court shall award custody of a child in accordance with the best interest of the child."

This is why, as the Court in *Tracie F.* underscored, *all* child custody determinations, *including actions to modify custody*, must be centered squarely this "sole criterion" by reference to La.Civ.Code arts. 131 and 134.

> Indeed, the legislative comments to La. C.C. art. 131 are greatly instructive for this case. According to 1993 Revision Comment (a), "the best interest of the child [is] the overriding test to be applied in *all* child custody determinations. The primacy of that test has been statutorily mandated in Louisiana since 1979 (C.C.Arts.134, 131(A) (1992); Acts 1979, No. 718), and the best interest principle itself has been jurisprudentially and legislatively recognized at least since 1921." (Emphasis added.) Leaving no room for doubt that the best interest of the child is the test for "*all* child custody determinations," (La. C.C. art. 131, 1993 Revision Comment (a)), a later comment to Article 131 stresses that "[t]his Article should be followed in actions to *change custody* as well as in those to initially set it." La. C.C. art. 131, 1993 Revision Comment(d) (emphasis added). Similarly, the comments to La. C.C. art. 134, which lists factors for determining the best interest of the child, indicates: "Article [134] should be followed in actions to change custody, as well as in those to fix it initially." La. C.C. art. 134, 1993 Revision Comment (d) (emphasis added).

10

Relying on these comments, this court stated that "[t]he primary consideration in a determination of child custody is the best interest of the child. This applies not only in actions setting custody initially, but also in actions to change custody." *Mulkey v. Mulkey*, 12–2709, pp. 9–10 (La.5/7/13), 118 So.3d 357, 364 (citing *Gray v. Gray*, 11–548, p. 19 (La.7/1/11), 65 So.3d 1247, 1258, which cited La. C.C. art. 131, 1993 Revision Comment (d)) (footnotes omitted).5 See also *AEB v. JBE*, 99–2668, p. 7 (La.11/30/99), 752 So.2d 756, 760–61. Comment (d) to article 131 states that the ("article should be followed in actions to change custody as well as in those to initially set it.").

*Tracie F.,* 188 So.3d at 238-39 (First emphasis added; footnotes omitted).

Thus, as the Court stated in *Tracie F.*, "Factors for ascertaining the best interest of the child are set forth in La. C.C. art. 134." *Id.* at 248. In its current form, there are fourteen such factors:

(1) The potential for the child to be abused, as defined by Children's Code Article 603, which shall be the primary consideration.

(2) The love, affection, and other emotional ties between each party and the child.

(3) The capacity and disposition of each party to give the child love, affection, and spiritual guidance and to continue the education and rearing of the child.

(4) The capacity and disposition of each party to provide the child with food, clothing, medical care, and other material needs.

(5) The length of time the child has lived in a stable, adequate environment, and the desirability of maintaining continuity of that environment.

(6) The permanence, as a family unit, of the existing or proposed custodial home or homes.

(7) The moral fitness of each party, insofar as it affects the welfare of the child.

(8) The history of substance abuse, violence, or criminal activity of any party.

(9) The mental and physical health of each party. Evidence that an abused parent suffers from the effects of past abuse by

the other parent shall not be grounds for denying that parent custody.

(10) The home, school, and community history of the child.

(11) The reasonable preference of the child, if the court deems the child to be of sufficient age to express a preference.

(12) The willingness and ability of each party to facilitate and encourage a close and continuing relationship between the child and the other party, except when objectively substantial evidence of specific abusive, reckless, or illegal conduct has caused one party to have reasonable concerns for the child's safety or well-being while in the care of the other party.

(13) The distance between the respective residences of the parties.

(14) The responsibility for the care and rearing of the child previously exercised by each party.

Applying these fourteen factors, the trial court determined, pursuant to the evidence presented, that nine of these Factors (1, 2, 3, 7, 8, 9, 11, 12, and 13) were either irrelevant or favored neither party; **none** favored Ms. Harper; and the trial court found that Factors 4, 5, 6, 10 and 14 favored the Harveys.

Yet notwithstanding these fact findings, the trial court rendered judgment in favor of Ms. Harper and granted her request to modify these parties' long-standing custody arrangements and their stipulated consent custody order.

Additionally, and except as limited to questions of law by this constitution, the appellate jurisdiction of courts of appeal extends to both law and facts, who are authorized to render judgments as provided by law or in the interest of justice. La. Const. art. 5, § 10.  Of particular relevance to this appeal, "Courts have inherent power to determine a child's best interest and to tailor a custody order, including visitation, that minimizes the risk of harm to the child." *Beene v. Beene*, 43,845 (La.App. 2 Cir. 10/22/08), 997 So.2d 169, 172.

12

*MATERIAL CHANGES IN CIRCUMSTANCES*

From the outset, the Harveys argue that Ms. Harper, as Mover, failed to carry her burden to establish both a material change in circumstances, and that Ms. Harper's proposed modification would be in Cheyenne's best interest, as to her request for modification of the stipulated custody decree of November 9, 2018. We agree.

*Factors 1, 2 & 3:*

We find that the trial court correctly determined, and there is no doubt this record shows, that both the Harveys and Ms. Harper love Cheyenne very much and both parties have the capacity and disposition to continue same.

However, we find that there is a significant difference as to Cheyenne's continuing education as to these parties. Specifically, a review of the factual evidence presented at trial shows that the Harveys were the sole and primary persons involved in Cheyenne's education, and educational activities over the last four to five years. The evidence further shows that the Harveys had enrolled Cheyenne in pre-school and currently in kindergarten classes at Ebarb High School in Sabine Parish.

Additionally, according to the uncontroverted testimony of Cheyenne's kindergarten teacher, Sherry Sepulvado (Ms. Sepulvado), Cheyenne is an "excellent" student, and Cheyenne is a "very happy" child at her school. Ms. Sepulvado further testified that, as it relates to Cheyenne and her schooling, the primary persons are the Harveys, and that Ms. Harper has never called, visited, or participated in any of Cheyenne's pre-school or school meetings or other school activities.

When questioned at the trial, Ms. Sepulvado testified:

> Q. Would you say she's happy with them?
>
> A. Yes. I mean, I've known these people all my life, and I'll say that I'm here for the – for the best- for the- for the little girl, not for you, not for them.
>
> ….
>
> She's happy at school. She talks about her rabbits, and I'm not saying anything, but she never speaks of her mom. Never does she ever tell you anything or talk to the kids about her mom. It's about these people."

Therefore, and although the trial court determined that factor three favored neither party, we are compelled to disagree given the undisputed factual evidence presented at the trial as to this factor and Cheyenne's continuing education.

*Factors 4 & 5:*

As to the Harveys, the record is clear that under their guidance and physical custody these grandparents have provided Cheyenne with a safe, secure and healthy environment in which Cheyenne has grown and flourished individually, educationally, and socially, to become a very bright healthy young girl. After weighing these factors, the trial court also explicitly found:

> "The factors favoring the Harveys almost all revolve around the fact that the child has been living with them, as they argue, in a safe and stable environment for over 4 years."

Additionally, the record shows that Ms. Harper had never provided any financial assistance in those four years prior to the July 2022 hearing, and the Harveys were the sole and primary care takers of Cheyenne. Ms. Harper did testify that she "was of the understanding" that whoever had the physical custody of Cheyenne, here the Harveys, would be responsible for her expenses. Nevertheless, and although Ms. Harper also testified that she was employed full time at an I-Hop restaurant, the record is clear that from November 2018 to December 2022, Ms.

14

Harper failed to provide any financial support, either to the Harveys or directly to Cheyenne. Notwithstanding this factual evidence and these fact findings, the trial court, after initially finding that these factors favored the Harveys, discounted same and found that these factors did not favor either party.

Thus, we are compelled to disagree with the trial court given the uncontroverted factual evidence as to these factors.

*Factor 6: Permanence of Family Home*

As found, the factual evidence clearly shows that the Harveys have provided Cheyenne with a safe and permanent home and environment in which Cheyenne has grown and flourished individually, educationally, and socially.

As to this factor, the only evidence submitted by Ms. Harper was her own testimony. Ms. Harper testified that she now has stable housing. However, she presented no corroborative or documentary evidence to support her contention that she in fact possesses her own apartment, and that it is occupied only by herself and her older daughter, Kimberly, such as a lease, utility bills, or such, bearing her name.

Moreover, and while Ms. Harper testified that she lived alone with her other daughter, Kimberly, there were indications that Ms. Harper had a "boyfriend" living with her. Both questions are very relevant as to factor 6, particularly as to the history of Ms. Harper's lack of any permanent or stable housing/living arrangements over the last three to four years prior to the July 2022 hearing. Thus, although the trial court determined that this factor favored neither party, we are compelled to disagree given the absence of sufficient and corroborating evidence produced by Ms. Harper as to this housing factor.

*Factor 8:  Ms. Harper- History of Substance Abuse.*

A review of the record clearly shows that the central element that coursed throughout these proceedings, since 2018, has been Ms. Harper's admitted substance abuse and mental health issues, both of which directly led to the stipulated custody order at issue herein. The record also shows that Ms. Harper initially spent ten days at Brentwood Hospital, followed by one month on an inpatient basis with CADA ("Council on Alcohol and Drug Abuse), from February 6, 2018, to March 6, 2018.

Ms. Harper is to be commended for her initially seeking assistance with these drug abuse problems in 2018, and now wishing to assume a larger everyday role in Cheyenne's life. However, the record is unexplainedly void of any evidence beyond January 2019 as to Ms. Harper's drug abuse problems, and as to her follow-up of CADA's out-patient recommendations, all to ensure her continued sobriety for that three to four year period.  Specifically, the record shows that upon release from her in-house treatment, CADA's out-patient recommendations were that Ms. Harper attend Intensive Outpatient (IOP) care, get a sponsor, and attend AA/NA/CA meetings.  However, the record contains no evidence or documentation of any kind for the period from January 22, 2019 to the July 2022 hearing date, which would corroborate Ms. Harper's testimony of her continuing sobriety or ever having relapsed as to her drug abuse problems since first getting help in 2018.

Despite this lack of evidence, the trial court's states in its findings as to this factor and issue:

> Ms. Harper has a past history of substance abuse, and apparently, therefore, criminal activity in the acquisition and/or use of illegal substances. However, the evidence presented at trial was that she was in recovery and had rehabilitated herself. There is no such history on behalf of the Harveys. *The court does not find that this factor favors either party.*

16

We find that the limited documentary evidence Ms. Harper presented was simply too limited, and outdated, with too large of a "gap" as to her treatment and follow-up, if any, she allegedly accomplished as to her drug abuse problems to carry her burden of proof. Here, the record contains no evidence beyond January 2019 demonstrating that Ms. Harper either attended Intensive Outpatient (IOP) care, acquired a sponsor, or attended AA/NA/CA meetings, to support her testimony that she never relapsed since first getting help in 2018.

In sum, we find that, except for Ms. Harper's self-serving testimony, the record is void of any evidence as to this very important issue/factor as to her continued sobriety and as to Ms. Harper's follow-up and continuing out-patient treatment, if any, since her initial treatment in 2018. Additionally, the trial court's finding that this factor does not favor either party totally ignores the fact that Ms. Harper has failed to provide evidence as to her continuing drug testing prescribed and ordered by the Consent Judgment of November 9, 2018.

Thus, in the absence of more contemporaneous evidence, we conclude that the trial court erred when it determined that Ms. Harper produced sufficient *recent* evidence to show that she had neutralized the impact of her drug abuse problems.

Thus, although the trial court determined that this factor favored neither party, we are compelled to disagree given the lack of sufficient evidence and unanswered questions as to this most critical issue in this custody matter as to the continued sobriety of Ms. Harper.

*Factor 13: Distance and Transportation*

The record establishes that the Harveys reside in Sabine Parish and Ms. Harper's latest residence is in Bossier Parish, with approximately seventy-eight miles separating Ms. Harper's apartment from the Harvey's home, yet the trial court

17

concluded that factor 13, the distance between the respective residences of the parties, held no bearing.

A review of this record shows that, again, except for Ms. Harper's own testimony, Ms. Harper failed to provide any proof that she currently has access to reliable transportation, a vehicle of her own, or even that she currently possesses a valid operator's/driver's license. These are a very important questions and issues in this custody matter given that the evidence presented at the trial shows Ms. Harper received a DWI citation, and the outcome, both criminally and administratively, from this said offense was still unknown at the time of the trial in December of 2022. This factor of reliable transportation is very important not only as to Ms. Harper's ability to safely and regularly transport Cheyenne on a daily basis to her activities, her school, and such, but more importantly as to transportation for Cheyenne or Ms. Harper in the event of an emergency on a 24-hour basis as the custodial parent.

As to the Harveys, the record is clear that they have provided and continue to provide sufficient and reliable transportation, as necessary to provide Cheyenne with any of her personal, educational and other needs, during their physical custody of Cheyenne over the last three to four years.

Therefore, and again given the absence of sufficient evidence by Ms. Harper as to this vital transportation issue, we find that the trial court erred in finding that this critical factor benefited neither party.

*BEST INTEREST OF CHEYENNE*

Our thorough review of the factual evidence contained in the record, including the trial court's findings, and after reviewing the evidence presented as to the 14 factors set forth in La. Civil Code article 134, we find that the trial court manifestly erred when it discounted those critical, original and continuing problems and factors.

Specifically, as to Ms. Harper's drug abuse and mental issues, which were the primary basis for this longstanding custody arrangement, and current stipulated custody order of November 9, 2018. All of which were specifically taken into consideration by these parties and the trial court as placed into this consent judgment to protect Cheyenne from harm, and provide for Cheyenne's best interest.

Therefore, we find that the factual evidence presented by Ms. Harper was insufficient to carry her burden of proof necessary to establish either a material change in circumstances, or to establish that Ms. Harper's proposed modification would be in Cheyenne's best interest, sufficient to allow for the modification of the stipulated custody decree of November 9, 2018.

Accordingly, we find that the best interest of the minor child, Cheyenne, is that the trial court's judgment of December 24, 2022, granting Laramie D. Harper's motion to modify the current stipulated custody order, be reversed and set aside; and that the parties' stipulated consent custody decree of November 9, 2018, be and is hereby *immediately* reinstated in full force and effect, with the custody of the minor child, Cheyenne, to be immediately returned to Faye and Nelford Harvey.

**DECREE**

For the foregoing reasons, we reverse and vacate the trial court's judgment of December 24, 2022, granting Laramie D. Harper's motion to modify custody, and further order that the stipulated custody decree of November 9, 2018 be and is hereby *immediately* reinstated in full force and effect. All court costs of this appeal are assessed to Laramie D. Harper.

**REVERSED AND RENDERED.**